UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| FELIPE ROSALES RUIZ, | ) | 1:08-CV-00964 AWI JMD HC |
| | ) | |
| Petitioner, | ) | FINDINGS AND RECOMMENDATION |
| | ) | REGARDING PETITION FOR WRIT OF |
| v. | ) | HABEAS CORPUS |
| | ) | |
| ROBERT HOREL, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Petitioner Felipe Rosales Ruiz ("Petitioner") is a State prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

### **PROCEDURAL HISTORY**

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation at Pelican Bay State Prison in Crescent City, California. (Pet. at 2). Petitioner is serving a sentence of ninety-eight years to life, pursuant to a conviction on September 2, 2005, in the Merced County Superior Court. (Pet at 2; Answer at 1). Petitioner was convicted of the following crimes:

Count 1: Attempted murder of Oscar Garcia Cervantez (Cal. Penal Code §§ 664 and 187) for which the trial court imposed a sentence of fifteen years to life;

Count 2: Shooting a gun at an occupied motor vehicle (Cal. Penal Code § 246) for which the trial court imposed a concurrent sentence of fifteen years that was stayed under California Penal Code section 654;

Count 3: Possession of a firearm by a felon (Cal. Penal Code § 12021(a)(1)) relating to the October 31, 2002, incident for which the trial court imposed a concurrent sentence of two years;

\\\

Count 4: Attempted murder of James Jackson (Cal. Penal Code §§ 664 and 187) for which the trial court imposed a consecutive sentence of fifteen years to life;

Count 5: Shooting at an inhabited dwelling(Cal. Penal Code § 246) for which the trial court imposed a consecutive sentence of eight months;

Count 6: Assault with a firearm on James Jackson (Cal. Penal Code § 245(a)(2)) for which the trial court imposed a consecutive sentence of three years;

Count 7: Assault with a firearm on Corey Nelson (Cal. Penal Code § 245(a)(2)) for which the trial court imposed a consecutive sentences of four years, which was stayed pursuant to section 654 of the California Penal Code;

Count 8: Assault with a firearm on Adrian Jynes (Cal. Penal Code § 245(a)(2)) for which the trial court imposed a consecutive sentences of one year; and

Count 9: Possession of a firearm by a felon (Cal. Penal Code § 12021(a)(1)) relating to the November 28, 2002, incident for which the trial court imposed a consecutive sentence of two years. (Answer as 1-2; Pet. Mem. P. & A[1]. at ii-iii).

The jury further found true sentencing enhancements consisting of: personally discharging a firearm causing great bodily harm (Cal. Penal Code § 12022.53(d)) for Counts 1-2; personally inflicting great bodily injury (Cal. Penal Code § 12022.7(a)) for Counts 1-2; committing the crime for the benefit of a street gang (Cal. Penal Code § 186.22(b)(5)) for Counts 1-2, 4-8; and personally using a firearm (Cal. Penal Code § 12022.5(a)(1)) for Counts 1-2, 4-8.[2] (Answer at 2).

Petitioner appealed his conviction and sentence to the California Court of Appeal, Fifth Appellate District. The Court of Appeal issued a decision on April 3, 2007, affirming Petitioner's conviction. (*See* Lod. Doc. 1). The appellate court vacated Petitioner's sentence as to count seven and remanded the matter to the trial court for resentencing. (Id at 7-8).

On June 20, 2007, the California Supreme Court granted the petition for review but deferred any further action pending an order of the court. (*See* Lod. Doc. 2). On September 12, 2008, the

---

[1] The petition contains a copy of Petitioner's brief to the California Court of Appeal. The Court construes this document to be Petitioner's Memorandum of Points and Authorities ("Pet. Mem. P. & A.").

[2] The trial court struck the enhancements for Count 5 at sentencing. (Answer at 3).

California Supreme Court transferred the matter back to Court of Appeal with directions to vacate its decision and reconsider the issue in light of *People v. Black*, 41 Cal.4th 799 (Cal. 2007) ("*Black* II") and *People v. Sandoval*, 41 Cal.4th 825 (Cal. 2007). (Lod. Doc. 3).

On remand, the Court of Appeal affirmed Petitioner's sentence and conviction on January 9, 2008. (*See* Lod. Doc. 4). The California Supreme Court denied review of this decision on March 26, 2008. (*See* Lod. Doc. 5).

On July 3, 2008, Petitioner filed the instant federal petition for writ of habeas corpus in the Northern District of California. (Court Doc. 1). The case was transferred to this Court on July 10, 2008. (Court Doc. 5).

On December 1, 2008, Respondent filed a response to the petition. Respondent does not allege that the petition is barred as untimely or that Petitioner has failed to exhaust his state remedies.

## **FACTUAL BACKGROUND**[3]

*Halloween Crime*

At about 4:00 p.m. on October 31, 2002, Mr. V. pulled up and parked his car on the street outside his friend's house in Merced. The neighborhood was largely affiliated with Norteño gangs, but Mr. V. and his friend associated with Sureño gang members. Mr. V. was wearing a blue shirt with a Mexican flag on the back and green shorts. Mr. V.'s friend came out and approached the passenger door, but Mr. V. told him to get a screwdriver so they could fix his car's fuse. Mr. V. sat in the driver's seat of his car while his friend went into the garage. Some of the car windows were down, including the rear window on the driver's side, but the driver's window was up because it did not work.

As Mr. V. was waiting, defendant and another Hispanic male walked toward his car and approached the driver's side. Mr. V. recognized defendant because Mr. V. previously had lived in the neighborhood, had seen defendant many times, and had had a confrontation with him once in the past.[4] Through the closed driver's window, defendant asked loudly, "[W]here are you from?" Mr. V. said, "I don't bang, nothing." Defendant asked him what he was doing there and Mr. V. said he was waiting for his friend. Defendant called him a southerner and said, "You fuckin' scrap," lifted up his

---

[3] The factual background is derived, verbatim, from the factual summary set forth in the January 9, 2008, unpublished opinion of the California Court of Appeal. A determination of fact made by a State court is presumed correct, pursuant to 28 U.S.C. §§ 2254(e)(1), and must be rebutted by the petitioner with clearly and convincing evidence.

[4] When Mr. V. worked in a local store, defendant had once tried to start a fight with him. Mr. V. and his uncle were outside the store talking. Mr. V. was playing with the broom he was using to clean the store mats. Defendant and some others were outside too. When Mr. V. spun the broom, the top plastic piece broke off and landed near defendant, who was standing 15 to 20 feet away. Defendant was angry and wanted to fight. He approached and accused Mr. V. of intentionally throwing the piece at him. Both Mr. V. and his uncle told defendant it was an accident. They went back inside the store and defendant left.

shirt and pulled a gun from his waistband.[5] Mr. V. closed his eyes and turned his face away. He wanted to jump into the backseat but did not have time. He heard the car door open and then heard gunshots. Defendant shot him several times, including in the face. Mr. V. estimated that defendant was standing about a foot and one-half from the car when he fired. When Mr. V. opened his eyes, he saw defendant and the other person running across the street. Mr. V. was treated for gunshot wounds to his mouth, arm and both legs. He was missing several teeth, some of which were later found inside his car.

When the police responded to the hospital, Mr. V. did not inform them that defendant had committed the shooting because he was afraid for his family. The police kept coming to Mr. V.'s house and he finally told them what had happened. Prior to that, he had told his family, but no one else. The police showed Mr. V. a photographic lineup and he identified defendant as the shooter. He testified that he was still afraid for his family but he did not want to give in anymore.

Mr. V.'s friend testified that while he was inside his garage looking for a screwdriver, he heard four gunshots. He ran out and saw Mr. V. getting out of the car, bleeding.

Mr. V. testified he had never been a gang member. He had a three-dot tattoo he had gotten in Mexico, but it only signified "My crazy life." It was very common in Mexico and really did not mean anything. After he got the tattoo, he discovered it could be considered a gang tattoo. He was also aware that blue was considered a gang color.[6] He did not know whether he associated with any gang members; he associated with people because they spoke Spanish and English.

Mr. V.'s friend said that neither he nor Mr. V. were gang members, but they both associated with members of the South Side Locs, a Sureño gang. He said he had been threatened several times and had even been assaulted regarding his testimony. He had been placed in the witness protection program.

Ms. A. testified she was in her house sitting on the sofa that afternoon. Her family and her sister, Ms. B., were also in the house. The front door was open, but the screen door was closed. Through the screen door, Ms. A. saw Mr. V. sitting in his car. He had his leg out of the car to hold the door open. Ms. A. saw defendant pull a gun out of his waistband, point it at Mr. V. and start shooting. First he shot with his right hand, then switched to his left hand and continued shooting back toward Mr. V. as he ran away. Defendant fired four or five shots. He ran through her driveway as he fled. When the police came, Ms. A. did not tell the police what she had seen because she was afraid of retaliation.

In January 2005, however, Ms. A.'s husband, who associated with Norteño gang members, was arrested in connection with the shooting. Ms. A. then decided to talk to the police because she knew her husband was not involved.

In June 2005, Ms. A. was arrested for failure to appear in court. She had been threatened and was afraid to testify. Her husband was told that something would happen to her if she appeared in court. On July 18, 2005, when she and her family were at home, shots were fired at her house. She and her children narrowly escaped being hit. She believed the shooting was related to her testimony in this case. At the time of the trial, she was willing to come forward and testify because she had gained the courage to say something and she had been placed in the witness protection program. She finally felt safe.

Ms. A.'s sister, Ms. B., who was in Ms. A.'s house on the afternoon of the shooting, heard yelling so she walked outside. She saw defendant, whom she knew,

---

[5]"Scrap" is a derogatory term used by Norteño gang members toward a Sureño gang member

[6]The number 13 and the color blue were claimed by Sureño gang members. The number 14 and the color red were claimed by Norteño gang members.

and another person. Then she saw defendant pull out a gun and shoot at Mr. V., whom she also knew. Defendant was about four feet from Mr. V. when he fired the shots. Ms. B. went back inside.

Following the incident, Ms. B. received threats regarding testifying at the trial. Some gang members walked by her and gestured as though they were pointing a gun at her and pulling the trigger. They were wearing red and baggie pants and their arms were tattooed. She was afraid to testify because she had young children and because her sister, Ms. A., had been the victim of a drive-by shooting.

Mr. C. was ten years old. He was sitting on a porch in the neighborhood. He saw two people walk across the street to the car, say something, open the door and shoot someone sitting inside the car. The person in the car had been inside the car the entire time.

Mr. D. was thirteen years old. He was also sitting on a porch in the neighborhood when he heard arguing followed by gunshots.

***Thanksgiving Crime***

About one month later, on November 28, 2002, in an alley in the neighborhood, three Black males were arguing with defendant and another Hispanic male. Defendant went into an apartment complex and returned with a gun. He lifted the gun to eye level and shot at the three Black males, who split up and ran in two different directions. Defendant continued shooting at them as they ran. His cohort tried to calm him, but defendant said, "They're Crips."

Defendant's cohort testified that he did not see the Black men with any type of weapon. Defendant's cohort stated that defendant was a Norteño gang member.

Ms. E. lived in the neighborhood. She heard gunshots, then her window shattering.

The police conducted a probation search of defendant's residence and found a revolver in the trash can inside the bathroom.

Defendant was interviewed by the police that day. He admitted that the gun and ammunition the police found belonged to him. He was having disputes with Black people and felt he needed to carry a gun. He said the three Black males had their hands under their shirts and he thought they were going to pull something out. He shot at them because he believed they posed a threat to him. He denied pointing the gun directly at them. After the shooting, he took the gun home and hid it. He claimed he had never fired a gun before and, although he was a validated Westside gang member, he was trying to stay out of gang activities. He believed, however, that the altercation with the three Black males was gang related.

***Gang Evidence***

The gang expert testified that defendant admitted he was a member of the Merced Ghetto Boys (MGB), a Norteño gang. He also admitted associating with Westside Merced, another Norteño gang.

On March 10, 1998, officers conducted a probation search of defendant's nephew's house, where defendant and his nephew shared a room. In that room the officers located a knife with a red bandana around it. The letters "WSM" were written on the dresser. The nephew was wearing a hat with "XIV" written on the inner bill. He said he "kick[ed] it" with Westside Merced. Defendant had four dots tattooed on his right hand.

On July 9, 1998, an officer contacted defendant when he was with three validated Westside Merced gang members. Defendant was wearing a red belt, red hat, black shorts, and a white shirt. He stated he had been "kicking it" with Westside Merced for a couple of months. He said he had "walked in." He had four dots tattooed on his right hand.

In 2000, when defendant was a minor, he admitted possessing a handgun.

On March 21, 2001, officers conducted another probation search of

> defendant's residence, where they found defendant with two validated gang members.
> On March 29, 2001, an officer contacted defendant at his residence. He stated he had been associating with Dead End Locs and Merced Ghetto Boys (MGB). He showed the officer his new tattoos. He had gotten one dot next to his right eye and four dots next to his left eye, and the number "14" on his left leg.
> At the time of the trial, defendant recently had enhanced and added to his gang-related tattoos while he was in jail.
> The gang expert testified that he had listened to a telephone call made by defendant from jail to a validated gang member. In the call, defendant told him "to get at" Ms. A., a witness.
> The gang expert explained that Norteños and Sureños were rival gangs. Norteños also experienced periods of conflict with members of the Crips gang, most of whom were Black.
> On cross-examination, the gang expert testified that Mr. V.'s friend was a Sureño living in a Norteño neighborhood. Mr. V.'s friend was a validated South Side Loc member.

(Lod. Doc. 4, Cal. Ct. App. Opinion, Fifth Appellate District, Jan. 9, 2008, at 3-8).

## DISCUSSION

**I.      Jurisdiction and Venue**

A person in custody pursuant to the judgment of a State court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution stemming from his conviction in the Merced County Superior Court. Petitioner is currently incarcerated at Pelican Bay State Prison, which is located in Del Norte County. While Del Norte County is not within this judicial district, Merced County does fall within this Court's jurisdiction. *See* 28 U.S.C. §§ 84(a) and (b). As a habeas case may be heard in either the judicial district where the petitioner was convicted and sentenced or the district where petitioner is currently in custody, the Court has jurisdiction over and is the proper venue for this action. *See* 28 U.S.C. § 2241(d).

**II.     ADEPA Standard of Review**

All petitions for writ of habeas corpus filed after 1996 are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), enacted by Congress on April 24, 1996. *Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied*, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th

Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by Lindh*, 521 U.S. 320 (holding AEDPA only applicable to cases filed after statute's enactment)). The instant petition was filed in 2008 and is consequently governed by AEDPA's provisions. *Lockyer v. Andrade*, 538 U.S. 63, 70 (2003).

As Petitioner's custody arises from a State court judgment, Title 28 U.S.C. section 2254 is the exclusive vehicle for Petitioner's habeas petition. *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1126-1127 (9th Cir. 2006) (quoting *White v. Lambert*, 370 F.3d 1002, 1006 (9th Cir. 2004) in holding that § 2254 is the exclusive vehicle for a habeas petitioner in custody pursuant to a State court judgment even though he is challenging the denial of his parole). Under AEDPA, a petition for habeas corpus "may be granted only if [Petitioner] demonstrates that the State court decision denying relief was 'contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.'" *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) (quoting 28 U.S.C. § 2254(d)(1)); *see also Lockyer*, 538 U.S. at 70-71.

As a threshold matter, this Court must "first decide what constitutes 'clearly established federal law, as determined by the Supreme Court of the United States.'" *Lockyer*, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Id.* (quoting *Williams*, 592 U.S. at 412). "In other words, 'clearly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the State court renders its decision." *Id.*

Finally, this Court must consider whether the State court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law." *Lockyer*, 538 U.S. at 72, (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the State court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the State court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413; *see also Lockyer*, 538 U.S. at 72. "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the State

court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant State court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the State court's application of clearly established law was "objectively unreasonable." *Id.* at 409.

Petitioner bears the burden of establishing that the State court's decision is contrary to or involved an unreasonable application of United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a State court decision is objectively unreasonable. *See Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003); *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).

AEDPA requires that a federal habeas court give considerable deference to State court decisions. The State court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). Furthermore, a federal habeas court is bound by a State's interpretation of its own laws. *Souch v. Schaivo*, 289 F.3d 616, 621 (9th Cir. 2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

### III.  Review of Petitioner's Claims

Petitioner raises three grounds for relief in the instant petition: (1) insufficient evidence to support Petitioner's conviction on Count Two; (2) insufficient evidence to support the sentence enhancements for Counts 7 and 8 for committing the crime for the benefit of a street gang; and (3) sentencing errors relating to the trial court's imposition of an upper term and consecutive sentences.

Petitioner raised the exact same claims in his direct appeal. The California Court of Appeal's last reasoned decision rejecting Petitioner's claims was filed on January 8, 2009. Petitioner's subsequent petition for review to the California Supreme Court was summarily denied. When reviewing a state court's summary denial, the Court "look[s] through" the summary disposition to the last reasoned decision. *See Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000) (citing

1  *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).  Thus, the California Supreme Court is presumed
2  to have adjudicated the claims for the same reasons cited by the California Court of Appeal in their
3  reasoned denial of Petitioner's claim.  *See Ylst v. Nunnemaker*, 501 U.S. at 803.

4     ***A. Ground One: Sufficiency of Evidence for Shooting at Occupied Vehicle***

5    Petitioner contends that his conviction for shooting at an occupied motor vehicle (Count
6  Two) violates his right to due process of the law as there is insufficient evidence to support his
7  conviction. (Pet. Mem. P. & A. at xv-xviii).

8    In reviewing sufficiency of evidence claims, California courts expressly follow the standard
9  articulated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979).  *See*
10 *People v. Smith*, 37 Cal.4th 733, 738-739 (Cal. 2005); *see also People v. Catlin*, 26 Cal.4th 81, 139
11 (Cal. 2001).  Due process, as guaranteed by the Fourteenth Amendment in State prosecutions,
12 provides that "no person shall be made to suffer the onus of a criminal conviction except upon
13 sufficient proof-defined as evidence necessary to convince a trier of fact beyond a reasonable doubt
14 of the existence of every element of the offense." *Jackson*, 443 U.S. at 316.

15   Pursuant to the Supreme Court's holding in *Jackson*, the test to determine whether a factual
16 finding is fairly supported by the record is as follows, "whether, after reviewing the evidence in the
17 light most favorable to the prosecution, any rational trier of fact could have found the essential
18 elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319; *see also Lewis v.*
19 *Jeffers*, 497 U.S. 764, 781 (1990).  Thus, "[a] petitioner for a federal writ of habeas corpus faces a
20 heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on
21 federal due process grounds."  *Juan H. v. Allen*, 408 F.3d 1262, 1274.  AEDPA requires that a
22 federal habeas court "apply the standards of *Jackson* with an additional layer of deference," and ask
23 "whether the decision of the California Court of Appeal reflected an 'unreasonable application' of
24 *Jackson* and *Winship* [397 U.S. 358 (1993)] to the facts of this case." *Id*. at 1274-1275 & n. 13.
25 Furthermore, this Court must presume the correctness of the State court's factual findings.  28 U.S.C.
26 § 2254(e)(1); *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986).  This presumption of correctness
27 applies to State appellate court's determinations of fact as well as those of the State trial courts.
28 *Tinsley v. Borg*, 895 F.2d 520, 525 (9th Cir. 1990).  Although the presumption of correctness does

not apply to State court's determinations of legal questions or to mixed questions of law and fact, the State court's factual findings underlying those determinations are entitled to the same presumption of correctness. *Sumner v. Mata*, 455 U.S. 539, 597 (1981).

Sufficiency of evidence claims are judged by "the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324, n. 16.   California Penal Code section 246 punishes "[a]ny person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house, occupied building, occupied motor vehicle..."  Here, Petitioner argues that "the evidence was clear that [Petitioner] fired his weapon only after he opened the door to the car in which Garcia Cervantez was sitting.  Under the logic expounded in [*People v. Stepney*, 120 Cal.App.3d 1016, 1021 (Cal. Ct. App. 1981)] such evidence does not support an interpretation that he fired *at* an occupied moto vehicle."  (Pet. Mem. P. & A. at xviii).  In *Stepney*, 120 Cal.App.3d at 1021, the California Court of Appeal reversed defendant's conviction under section 246, concluding that defendant's conduct, firing shots while he was in the livingroom of the dwelling, did not constitute shooting at the dwelling. *See also People v. Morales*, 168 Cal.App.4th 1075, 1080-1081 (Cal. Ct. App. 2008) (finding that a shooter who fired shots into the kitchen from the attached garage is not firing at a dwelling since the garage was an attached and integral part of the house).  Petitioner advocated for the extension of *Stepney* to his case on direct review; in essence arguing that he could not have fired at the vehicle as the door was open and therefore he was inside the vehicle.  The State appellate court found Petitioner's reliance on *Stepney* misguided, rejecting the application of *Stepney* to Petitioner's case.  (Lod. Doc. 4 at 9).  The appellate court noted that there was no evidence presented at trial that Petitioner was inside the vehicle during the shooting.  The evidence at trial indicated that Petitioner was one and a half feet to four feet away from the car when he fired the shots.  (RT at 121, 181).  Additionally, Petitioner continued firing as he fled from the scene.  (Rt at 231).  The State court thus found  Petitioner's case distinguishable from *Stepney*.

The Court does not find that the appellate court's decision was an objectively unreasonable application of *Jackson*.  Furthermore, the Court must accept the State court's factual finding that there was no evidence Petitioner was inside of the vehicle.  Additionally, the State court's conclusion that opening the door did not constitute being inside the vehicle for the purposes of extending

*Stepney* to Petitioner's case is a matter of State law.  This Court defers to a State court's interpretation of State law.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (citing to *Estelle*, 502 U.S. at 67-68, and *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) for the proposition that, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus").  Even if the Court could disturb the State's court finding that *Stepney* is inapplicable to Petitioner's case, Petitioner's argument that opening the car door constituted being within the vehicle is unavailing.  Thus, Petitioner is not entitled to relief on this ground.

### B.     Ground Two: Sufficiency of Evidence for Gang Enhancements

Petitioner received sentenced enhancements of ten years, under California Penal Code section 186.22(b)(1)(C), for Counts 7 and 8 (assault with a firearm).  Petitioner challenges the sufficiency of the evidence at trial to support the enhancements under section 186.22.

As noted previously, "[t]o prevail on an insufficiency of evidence claim, a habeas petitioner must show that 'upon the record evidence adduced at the trial[,] no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'"  *Briceno v. Scribner*, 555 F.3d 1069, 1078 (9th Cir. 2009) (quoting *Jackson*, 443 U.S. at 324).  The Ninth Circuit has further clarified that an enhancement under this statute requires that the "prosecutor prove two things.  First, the prosecutor must demonstrate that the defendant committed a felony for the benefit of, at the direction of, or in association with [a] criminal street gang.'  Cal. Penal Code § 186.22(b)(1).  Second, the prosecutor must show that the defendant committed the crime with the specific intent to promote, further, or assist in any criminal conduct by gang members.'" *Id* (citing to *Garcia v. Carey*, 395 F.3d 1099, 1102-03 & n. 5 (9th Cir.2005) in noting "the importance of keeping these two requirements separate," and "emphasiz[ing] that the second step is not satisfied by evidence of mere membership in a criminal street gang alone").

Per California statute, a "'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities

the commission of one or more of the [enumerated criminal acts specified in subdivision (e)],[7] having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." Cal. Penal Code § 186.22(f). As used in section 186.22, a "'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the [enumerated criminal offenses], provided...the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." Cal. Penal Code § 186.22(e).

Here, Petitioner challenges the sufficiency of the evidence with regards to the first requirement and more specifically, Petitioner contends that there was insufficient proof that the primary activities of the Merced Ghetto Boys ("MGB") were the enumerated acts specified in 186.22(e). As noted by the appellate court in this case, the California Supreme Court has elaborated on the primary activities element, stating that, "[t]he phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerates crimes is one of the group's 'chief' or 'principal' occupations...[t]hat definition would necessarily exclude the occasional commission of those crimes by the group's members." (Lod. Doc. 4 at 10) (citing *People v. Sengpadychith*, 26 Cal.4th 316, 323 (Cal. 2001)). The State court further recognized that:

> To prove the primary activities element, the prosecution may offer evidence that the gang's members consistently and repeatedly have committed crimes

---

[7] The enumerated crimes are: assault with a deadly weapon or by means of force likely to produce great bodily injury, as defined in § 245; robbery, as defined in Chapter 4 (commencing with § 211) of Title 8 of Part 1; unlawful homicide or manslaughter, as defined in Chapter 1 (commencing with § 187) of Title 8 of Part 1; sale, possession for sale, transportation, manufacture, offer for sale, or offer to manufacture controlled substances as defined in §§ 11054, 11055, 11056, 11057, and 11058 of the Health and Safety Code; shooting at an inhabited dwelling or occupied motor vehicle, as defined in § 246; discharging or permitting the discharge of a firearm from a motor vehicle, as defined in subdivisions (a) and (b) of § 12034; arson, as defined in Chapter 1 (commencing with § 450) of Title 13; intimidation of witnesses and victims, as defined in § 136.1; grand theft, as defined in subdivision (a) or (c) of § 487; grand theft of any firearm, vehicle, trailer, or vessel; burglary, as defined in § 459; rape, as defined in § 261; looting, as defined in § 463; money laundering, as defined in § 186.10; kidnapping, as defined in § 207; mayhem, as defined in § 203; aggravated mayhem, as defined in § 205; torture, as defined in § 206; felony extortion, as defined in §§ 518 and 520; felony vandalism, as defined in paragraph (1) of subdivision (b) of § 594; carjacking, as defined in § 215; sale, delivery, or transfer of a firearm, as defined in § 12072; possession of a pistol, revolver, or other firearm capable of being concealed upon the person in violation of paragraph (1) of subdivision (a) of § 12101; threats to commit crimes resulting in death or great bodily injury, as defined in § 422; theft and unlawful taking or driving of a vehicle, as defined in § 10851 of the Vehicle Code; prohibited possession of a firearm in violation of §12021; carrying a concealed firearm in violation of §12025; carrying a loaded firearm in violation of §12031.

> enumerated in the gang statute ( id. at p. 324), or the prosecution may offer expert testimony of the type found in Gardeley, supra, 14 Cal.4th 605, where a police gang expert testified that the defendant's gang "was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies. [Citation.]" (Sengpadychith, supra, at p. 324; Gardeley, supra, 14 Cal.4th at p. 620; People v. Vy (2004) 122 Cal.App.4th 1209, 1223, fn. 9 and cases cited therein.)
>
> "Evidence of past or present conduct by gang members involving the commission of one or more of the statutorily enumerated crimes is relevant in determining the group's primary activities." ( Sengpadychith, supra, 26 Cal.4th at p. 323.) Such evidence alone, however, is not necessarily sufficient to establish the primary activities requirement. ( Id. at pp. 323-324.) Indeed, "evidence sufficient to show only one offense [enumerated under section 186.22, subdivision (e) ] is not enough." ( In re Jorge G. (2004) 117 Cal.App.4th 931, 945; see also People v. Perez (2004) 118 Cal.App.4th 151 ( Perez ) [beating six years before subject crime and crime spree of four shootings less than a week before the subject crime held insufficient to establish predicate crimes were one of "primary activities" of gang].)

(Lod. Doc. 4 at 10-11).

While Petitioner acknowledges that the testimony of an expert witness could provide sufficient proof of the gang's primary activities, Petitioner contends that the testimony of Sgt. Trinidad was insufficient. (Pet. Mem. P. & A. at xxii). Specifically, Petitioner contends that Sgt. Trinidad was never qualified as an expert as the trial court never ruled on the motion to certify Sgt. Trinidad. (Id). Furthermore, Petitioner contends that Sgt. Trinidad's testimony was insufficient as he failed to recall with specificity any particular crime committed by a MGB member. (Id. at xxiii).

The State court rejected Petitioner's contention, finding that the trial court implicitly ruled on the motion and qualified Sgt. Trinidad as an expert. (Lod. Doc. 4 at 9, fn. 5). This was not an unreasonable determination of fact as the following exchange reveals:

> [Prosecutor]: How does someone join a gang?
> [Trinidad]: Usually there is a couple–
> [Defensel]: Objection, foundation.
> The Court: Uhmm–
> [Prosecutor]: Your honor, at this point I would offer Sergeant Trinidad as an expert in gangs.
> The Court: You're referring to the gangs that he's familiar with it?
> [Prosecutor]: Right.
> The Court: Overruled.

(RT at 405-406).

Furthermore, the Court of Appeal concluded that the prosecution had produced sufficient evidence for a reasonable trier of fact to have found that the primary activity of MGB members was the criminal conduct enumerated in California Penal Code section 186.22(e). The appellate court's

summarized the evidence, stating:

> Trinidad testified that the primary activities of the MGB gang members were assault with a firearm, shooting at an inhabited dwelling, selling drugs, witness intimidation, auto theft, and residential and commercial burglary. The evidence established that defendant, a Norteño gang member, shot at Mr. V., who associated with rival Sureño gang members. The evidence also established that, about a month later, defendant shot at some rival Crip gang members. In addition, Trinidad testified that other gang members had committed one or more of the offenses enumerated in section 186.22, subdivision (e). Specifically, defendant had been convicted of burglary in 2001. Validated MGB gang member, Eliodoro Martinez, had been convicted of assault with a firearm and burglary of a vehicle in 2003. Defendant had also been arrested for being a minor in possession of a firearm in 2000. Validated MGB gang member, Luis Canelo, recently had been arrested for witness intimidation.

(Lod. Doc. 4 at 11-12).

Here, the testimony of Sgt. Trinidad provided ample evidence for a reasonable trier of fact to conclude that a primary activity of the MGB members, including Petitioner, was some of the enumerated activities listed in the statute. As noted in *Briceno*, expert testimony may go to the ultimate question. *Briceno*, 555 F.3d at 1077-1078. Thus, the Court does not find the appellate court's decision to be an unreasonable application of *Jackson*. Therefore, Petitioner is not entitled to relief on this ground.

### C.     Ground Three: Sentencing Errors

In his third ground for relief, Petitioner contends that his Sixth and Fourteenth Amendment rights[8] were violated by the trial court's imposition of the upper term in Count 7 and consecutive sentences for count 4, 5, 7, and 8. (Pet. Mem. P. & A. at xxiv-xxvii). The California Court of Appeal's January 2008 opinion upheld the imposition of both the upper term and the consecutive sentences.

#### 1.     *Imposition of Upper Term*

Petitioner argues that the trial court's actions violated clearly established federal law, as stated by the Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and its progeny. In *Apprendi*, the United States Supreme Court overturned a state sentencing scheme as violative of a

---

[8] The United States Supreme Court has previously stated that, "the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones v. United States*, 526 U.S. 227, 246 n. 6) (1999). In *Apprendi v. New Jersey*, 530 U.S. 466, 475 (2000), the Supreme Court recognized that "[t]he Fourteenth Amendment commands the same answer."

criminal defendant's right to have a jury verdict based on proof beyond a reasonable doubt. The sentencing scheme permitted a trial judge to enhance a defendant's penalty beyond the prescribed statutory maximum upon a finding by a preponderance of the evidence that the defendant committed the crime with racial animus. *Id*. at 469. The Supreme Court held that the Sixth Amendment right to a jury trial required that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to jury, and proved beyond a reasonable doubt." *Id.* at 490. In *Blakely v. Washington*, 542 U.S. 296, 303-304 (2004), the high court explained that the "statutory maximum" is the maximum sentence a judge may impose based exclusively on the facts reflected in the jury verdict or admitted by the defendant and not the maximum sentence a judge may impose after finding additional facts.

The United States Supreme Court subsequently found that the imposition of upper terms, as delineated in California's Determinate Sentencing Law, based on facts found by a judge violated a criminal defendant's constitutional rights. *See Cunningham v. California*, 549 U.S. 270, 293 (2007) (overruling *People v. Black*, 35 Cal.4th 1238 (2005)). The *Cunningham* court noted that the middle term specified in California's statutes was the relevant statutory maximum for the purpose of applying *Blakely* and *Apprendi*. The high court thus concluded that the imposition of the upper term based solely upon a trial judge's fact finding violated the defendant's Sixth and Fourteenth Amendment rights because it "assigns to the trial judge, not the jury, authority to find facts that expose a defendant to an elevated 'upper term' sentence." *Id.* at 274.

"[T]he relevant question is not what the trial court *would* have done, but what it legally *could* have done." *Butler v. Curry*, 528 F.3d 624, 648-649 (9th Cir. 2008) (emphasis in original). Only one aggravating factor need to be proven for imposition of the upper term in California. *See. Black II,* 41 Cal.4th at 806; *Butler*, 528 F.3d at 642-643. As noted by the State appellate court here, the Supreme Court's holding in *Cunningham* contained an exception for the trail court's use of a prior conviction to impose the upper term. (Lod. Doc. 4 at 13). The appellate court thus concluded that:

> Here, in imposing the upper term, the trial court relied on (1) defendant's prior convictions as an adult and his sustained petitions as a juvenile were numerous and increasing in seriousness; (2) defendant was on probation when he committed the offense; (3) defendant's prior performance on probation or parole was unsatisfactory; and (4) defendant attempted to interfere with the judicial process as demonstrated by a

1 | taped discussion played in court. Because the trial court relied on defendant's record
2 | of prior convictions in imposing the upper term, defendant's federal constitutional
right to a jury trial under the Sixth Amendment and his right to due process under the
3 | Fourteenth Amendment as explained in *Blakely* and *Cunningham* were not violated.
(*Black II, supra*, 41 Cal.4th at p. 818.).

4 (Id. at 21).

5        The State court was correct in noting that the imposition of a term beyond the prescribed

6 statutory maximum based on a judge finding's of a prior conviction does not implicate a criminal

7 defendant's right to a jury trial or his right to due process of the law. *See Almendarez-Torres v.*

8 *United States*, 523 U.S. 224, 244 (1998) (holding that fact of prior conviction need not be pleaded in

9 an indictment or proved beyond a reasonable doubt); *but cf. Butler*, 528 F.3d at 644-645 (questioning

10 whether scope of prior conviction exception in *Almendarez-Torres* applies to facts not apparent on

11 the face of the conviction documents and citing to *United States v. Kortgaard* 425 F.3d 602, 610 (9th

12 Cir. 2005) for the proposition that the exception in *Almendarez-Torres* is a narrow one subject to

13 certain limitations).  The Ninth Circuit's concern about the use of facts derived from a prior

14 conviction inapplicable to the current case as the trial court used the prior convictions and not the

15 facts of those convictions to impose the upper term.  Consequently, the State court's finding that it

16 was permissible for the trial court to rely on prior convictions in imposing the upper term was not an

17 objectively unreasonable application of clearly established federal law.  Petitioner is not entitled to

18 relief based on this ground.

19                 ***2.***       ***Imposition of Consecutive Sentences***

20        Petitioner additionally challenges the imposition of consecutive sentences in Count 4,5,7, and

21 8.  The appellate court noted that *Cunningham* did not speak to the imposition of consecutive

22 sentences.  The United States Supreme Court subsequently validated this argument, holding in

23 *Oregon v. Ice*, 129 S.Ct. 711, 717-718 (2009), that the imposition of consecutive sentences based

24 upon the trial judge's factual findings does not violate a Petitioner's constitutional rights.  *See id*.  In

25 *Oregon v. Ice*, the United States Supreme Court distinguished imposing a consecutive sentence from

26 an upper term, finding that a trial judge does not usurp the traditional role of the injury in imposing a

27 consecutive sentence as "[t]he decision to impose sentences consecutively is not within the jury

28 function that 'extends down centuries into the common law.'" *Id*. (quoting *Apprendi*, 530 U.S. at

477). Thus, the Supreme Court in *Ice* found that a state's sentencing scheme permitting a judge to impose a consecutive sentence based on the trial judge's fact finding did not violate the defendant's constitutional rights. Similarly, Petitioner's constitutional rights were not implicated by the trial court's imposition of consecutive sentences.

## RECOMMENDATION

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) *court* days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(c). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    July 30, 2009**              /s/ John M. Dixon
                                       UNITED STATES MAGISTRATE JUDGE